*This opinion is subject to revision before final publication in the Pacific Reporter*

**2023 UT 26**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH,
*Petitioner,*

*v.*

ALFONSO VALDEZ,
*Respondent.*

No. 20210175
Heard March 16, 2022
Reheard March 8, 2023
Filed December 14, 2023

On Certiorari to the Utah Court of Appeals

Second District, Ogden
The Honorable Joseph M. Bean
No. 171901990

Attorneys[1]:

Sean D. Reyes, Att'y Gen., Melissa A. Holyoak, Solic. Gen.,
Andrew F. Peterson, Thomas B. Brunker, Deputy Solics. Gen.,
Christopher A. Bates, Asst. Solic. Gen., Salt Lake City, John J.
Nielsen, Salt Lake City, Michelle A. Jeffs, Rachel M. Snow, Ogden,
for petitioner

Emily Adams, Freyja Johnson, Bountiful, for respondent

---

[1] Amici Curiae: John M. Mejia, Salt Lake City, for American Civil Liberties Union of Utah Foundation, Inc., American Civil Liberties Union Foundation, and Electronic Frontier Foundation; Jeffery C. Corey, John E. Cutler, Jordan E. Westgate, Salt Lake City, for National Association of Criminal Defense Lawyers

JUSTICE PETERSEN authored the opinion of the Court, in which CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE PEARCE, JUSTICE HAGEN, and JUDGE WALTON joined.

At the initial oral argument in this matter, JUSTICE LEE and JUSTICE HIMONAS did not sit due to their retirements. DISTRICT COURT JUDGES JOHN J. WALTON and MATTHEW L. BELL sat.

The Court reheard this case after receiving supplemental briefing and the addition of two new Justices to the Court.

Following her appointment to the Court, JUSTICE HAGEN sat for JUDGE MATTHEW L. BELL.

Having recused herself, JUSTICE POHLMAN did not participate herein; DISTRICT COURT JUDGE JOHN J. WALTON sat.

---

JUSTICE PETERSEN, opinion of the Court:

## INTRODUCTION

¶1    Police officers arrested Alfonso Valdez for kidnapping and assaulting his ex-girlfriend. He had a cell phone in his pocket, and the officers seized it from him. At some point thereafter, the officers obtained a search warrant for the contents of Valdez's phone. But they were unable to access the phone's contents because they could not crack his passcode. So a detective approached Valdez, informed him that he had a warrant for the contents of the cell phone, and asked Valdez to provide his passcode. Valdez refused. Without the passcode, the police were never able to unlock the phone to search its contents.

¶2    Later, at Valdez's trial, the State elicited testimony from the detective about Valdez's refusal to provide his passcode when asked. And during closing arguments, the State argued in rebuttal that Valdez's refusal and the resulting lack of evidence from his cell phone undermined the veracity of one of his defenses. The jury convicted Valdez.

¶3    But on appeal, the court of appeals reversed the conviction. It agreed with Valdez that he had a right under the Fifth Amendment to the United States Constitution to refuse to provide his passcode, and that the State violated that right when it used his refusal against him at trial. The court found that the error was not harmless beyond a reasonable doubt, and it reversed Valdez's conviction and remanded the case back to the district court for further proceedings.

¶4    On certiorari, the question before us is whether the State's references at trial to Valdez's refusal to provide his passcode constituted impermissible commentary on his decision to remain silent. Both the State and Valdez contend that the answer to this question turns on whether Valdez's refusal is protected by the Fifth Amendment's privilege against self-incrimination. The Fifth Amendment applies where a communication (here, providing a cell phone passcode) is compelled, testimonial, and incriminating. *See Hiibel v. Sixth Jud. Dist. Ct. of Nev.*, 542 U.S. 177, 189 (2004).

¶5    The State does not challenge the court of appeals' determination that the communication at issue was compelled and incriminating. The State's only objection to the court of appeals' Fifth Amendment analysis is that providing a passcode is not a testimonial communication. The State contends this is so because the passcode itself "lacks 'semantic content and is entirely functional,'" and therefore "turning it over is akin to handing over a physical key—a non-testimonial act." (Quoting David W. Opderbeck, *The Skeleton in the Hard Drive: Encryption and the Fifth Amendment*, 70 FLA. L. REV. 883, 916 (2018).) Because of this, the State also argues that an exception to the Fifth Amendment referred to as the "foregone conclusion" exception applies here. The State reasons that, even if providing a passcode could be considered testimonial, the only meaningful information it would have conveyed here was that Valdez knew the passcode to the phone. But because the police already knew the phone belonged to Valdez—and presumably that he would know the passcode to his own phone—this information would not convey anything new to law enforcement. The State argues that this triggers the foregone conclusion exception. Finally, the State argues in the alternative that during the trial, Valdez put the contents of his phone at issue, so the prosecutor's comments were permissible as a fair response to an issue that Valdez initiated.

¶6    Whether an accused has a Fifth Amendment right not to disclose a passcode to an electronic device when law enforcement has a valid warrant to search the device is a question of first impression for this court. The United States Supreme Court has not yet addressed this specific question, so we analyze existing Fifth Amendment precedent to determine how it should extend to this new factual context.

¶7    The prevalence of passcodes that encrypt the information on electronic devices—which are often seized by law enforcement while investigating criminal conduct—has raised important

questions about how the Fifth Amendment extends to law enforcement's efforts to unlock these devices and decrypt the contents inside. These questions have proven to be especially complex where law enforcement attempts to access the contents of a seized device by means that do not require the suspect to disclose the actual passcode—like, for example, obtaining an order to compel the suspect to provide an unlocked device.

¶8 But that is not the situation we have before us. Here, law enforcement asked Valdez to verbally provide his passcode. While these circumstances involve modern technology in a scenario that the Supreme Court has not yet addressed, we conclude that these facts present a more straightforward question that is answered by settled Fifth Amendment principles.

¶9 We agree with the court of appeals that verbally providing a cell phone passcode is a testimonial communication under the Fifth Amendment. And we also agree that the "foregone conclusion" exception does not apply. This exception arises in cases analyzing whether an "act of production" has testimonial value because it implicitly communicates information. But here, we have a verbal communication that would have explicitly communicated information from Valdez's mind, so we find the exception inapplicable. Finally, we reject the State's "fair response" argument because the State elicited the testimony about Valdez's refusal to provide his passcode in its case in chief before Valdez had raised any issue involving the contents of his phone.

¶10 Accordingly, the State has not provided a basis for reversal. We affirm the court of appeals.

## BACKGROUND[2]

¶11 Alfonso Valdez and Jane[3] dated and lived together briefly. Valdez was often violent during the relationship. Ultimately, Jane and Valdez separated, and Jane moved out.

¶12 Two months later, Valdez texted Jane and asked her to meet him. In the text exchange, Valdez claimed that he had

---

[2] "On appeal from a jury trial, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly." *State v. Speights*, 2021 UT 56, ¶ 4 n.1, 497 P.3d 340 (cleaned up).

[3] We use a pseudonym to protect the identity of the victim in this case.

received some of Jane's mail after she moved out and wanted to give it to her. Jane agreed to meet Valdez outside her work following one of her shifts, but she feared that Valdez might become violent.

¶13   At the agreed-upon time and place, Jane located Valdez in his SUV and approached the passenger side. But rather than presenting her with mail, Valdez pointed a handgun at her and told her to get into the vehicle. She complied, and Valdez drove away with Jane in the car. As he was driving, Valdez verbally and physically assaulted Jane. He also forced her to give him her cell phone and purse. Jane was eventually able to jump out of the car and run away. She called the police from a nearby residence, but Valdez was gone before the police arrived.

*The Investigation*

¶14   The police located Valdez at his home that evening. They arrested him and transported him to the police station for questioning.

¶15   There, a detective seized Valdez's cell phone from him. He then read Valdez the *Miranda* warnings. And Valdez chose not to speak with the detective.

¶16   At some point that is not clear from the record, the police obtained a search warrant for Valdez's phone.[4] But the phone was protected by a nine-dot pattern passcode, which the police did not know. They made numerous failed attempts to access the contents of the phone without the passcode.

¶17   Later, under circumstances that are not developed in the record, the detective approached Valdez and asked Valdez to provide the phone's passcode. The detective explained that he had a search warrant for the phone, and that if Valdez did not give him the passcode, he would have to unlock the phone with a "chip-off" procedure that would destroy the phone in the process. Valdez

_____

[4] This search warrant was not made part of the record on appeal. Further, the record is unclear as to whether the search warrant provided authority only for police to obtain the contents of the cell phone, or also explicitly included authority for police to obtain the phone's passcode to execute the search. During a colloquy with the district court at trial, the State said that "[a] warrant was obtained for the *passcode*." But when questioning the detective, the State asked him if he obtained a "warrant to search the *phone*," to which he replied, "Yes, I did." (Emphasis added.)

refused to give the detective his passcode and told the detective to just "destroy the phone."

¶18 Law enforcement was unable to retrieve the contents of Valdez's cell phone. As it turned out, even the chip-off procedure would not work. And during the criminal proceeding, the State did not move to compel Valdez to provide the passcode. Notably, the police were also unable to locate Jane's cell phone following the incident. So they were never able to look for evidence in either phone of the text exchange that led to Jane meeting with Valdez.

*Valdez's Trial*

¶19 Valdez's case went to trial. During the State's case in chief, the detective testified that although the police had a search warrant for Valdez's phone, they "were unable to gain access to the data inside the phone." The State then asked the detective, "[A]re you familiar with why you were unable to access the data?" He answered, "Yes." The State continued: "Why is that?" When the detective began to respond about the need for a passcode, defense counsel promptly requested a bench conference.

¶20 Counsel argued to the district court that Valdez had "a Fifth Amendment right . . . to not provide [that] information." The State responded that "a warrant was obtained for the [passcode]," the detective "served the warrant on [Valdez]," and "[Valdez] refused to give the [passcode]." The State then argued that "[t]he jury ha[d] a right to know why the officers were unable to access the phone when there could have been evidence very pertinent to the case." The district court overruled defense counsel's objection.

¶21 The detective went on to testify about the specifics of his attempt to obtain Valdez's passcode. He relayed that he had "explained to [Valdez] that [he] had a search warrant" and was "asking for his passcode, otherwise [the police] were going to have to attempt to chip [it] off, [a] maneuver [where] you send [the phone] down to the lab at Dixie laboratories," which "destroys the phone." He testified that in response, Valdez refused to give his passcode and, seemingly in reference to the likely result of the chip-off procedure, told the detective that he could "destroy the phone."

¶22 After the State rested its case, Valdez moved for a mistrial based in part on the State's elicitation of the detective's testimony about Valdez's refusal to provide his cell phone passcode—again citing Fifth Amendment protections. After hearing argument on the motion, the district court stated that "the Fifth Amendment does not necessarily protect someone from . . . almost obstructing

an investigation by refusing to cooperate with police." The district court explained that it was not inclined to treat Valdez's refusal to give the passcode as warranting Fifth Amendment protection. But the district court told the parties that it wanted to consider the issue further before making a definitive ruling. Ultimately, however, neither the parties nor the district court raised the motion again and, accordingly, no final ruling was made on the matter.

¶23  Next, the defense called multiple witnesses in Valdez's case in chief. Of relevance here, the defense called Valdez's ex-wife to the stand. The ex-wife's testimony countered Jane's earlier description of the incident with Valdez. She testified that shortly before Jane met Valdez at his SUV, Jane had shown her texts between Jane and Valdez that were "sexual of some nature" and that demonstrated, "between the both of them[,] a little anger, maybe kind of a makeup kind of thing." In contrast to the State's theory of a violent kidnapping, the ex-wife's testimony painted Valdez and Jane's encounter as consensual.

¶24  During closing arguments, the State argued in rebuttal that the ex-wife's testimony was not credible because the texts were not in evidence:

> Now, you heard [the ex-wife] say that she saw some texts. They were going to get back together and do sexual things. The state was very interested. You heard testimony from . . . witnesses about the efforts that were taken to get into the defendant's phone to determine what, if any, communication happened between the two of them. You heard testimony about how the state used the lab that we had here. Detective Hartman came and testified about the process that he went through, that the Weber County lab was unable to get into that phone. How there was an attempt made by [the detective] to reach out to another lab within the system. But that system was also unable to get into the phone. *The only way they could get into that phone to see what these text messages said was by getting the code from the defendant. And he chose to decline to do that.*
>
> And they then attempted to use different codes . . . some common [passcodes], and got it to the point where I think he said there were three attempts left and the phone was going to . . . [g]o back to a factory reset. And it would lose all the information. And, at

that point, [the detective] stopped trying. They didn't want to lose the data on the phone.

The state made and took a lot of effort to see what communications had gone on between them. Instead of providing any proof of text messages, they bring in the defendant's ex-wife to say that she, [who] didn't have a good relationship with the victim, happened to see the text between them [that] was of a sexual nature. Think of the motive she had to lie. . . . Ladies and gentlemen, use your common sense. Those texts [aren't] here today.

¶25 The jury convicted Valdez of aggravated assault and the lesser included offenses of kidnapping and robbery. Valdez appealed.

*Court of Appeals' Decision*

¶26 In the court of appeals, Valdez argued that the State violated his Fifth Amendment privilege against self-incrimination when it commented at trial on his refusal to provide the cell phone passcode. In analyzing this claim, the court of appeals stated that it was not contested that Valdez had been "compelled" to provide the passcode and that providing the passcode would have been "incriminating." The court reasoned that the passcode was compelled because "[t]he State implied at trial that Valdez had an obligation to provide the swipe code to the investigating officers, and that he had no right to refuse." *State v. Valdez*, 2021 UT App 13, ¶ 25, 482 P.3d 861. And the court concluded that the passcode would have been incriminating because "it has long been settled that the Fifth Amendment's self-incrimination protection encompasses compelled statements that lead to the discovery of incriminating evidence even though the statements themselves are not incriminating and are not introduced into evidence." *Id.* (cleaned up).

¶27 Accordingly, the court of appeals focused on whether a verbal statement of the passcode would have been "testimonial." *Id.* ¶ 26. Noting that the record was not clear, based on the "best reading of the record," the court proceeded with the understanding that the detective had asked "Valdez to make an affirmative verbal statement" "to provide the swipe code itself." *Id.* ¶¶ 34–35. And the court held that this "would have unquestionably been testimonial." *Id.* ¶ 35.

8

¶28 Next, the court of appeals assessed the State's contention that even if a verbal expression of the passcode were testimonial, such a statement would fall within what has been termed the "foregone conclusion" exception to the Fifth Amendment.[5] The State argued that this exception applied because the passcode had "minimal testimonial significance" and added nothing to the State's case against Valdez. *Id.* ¶ 36. The court of appeals disagreed. It concluded that the exception is limited in scope, and the request for Valdez to verbally provide his passcode did not fall within the exception's tight boundaries. *Id.* ¶¶ 37–44.

¶29 Having determined that Valdez's refusal to provide his passcode was protected by the Fifth Amendment, the court of appeals concluded that the State's commentary at trial on Valdez's refusal was a Fifth Amendment violation. *Id.* ¶¶ 45–48. The court rested its holding on *Griffin v. California*, 380 U.S. 609 (1965), which held that the Fifth Amendment forbids either comment by the prosecution or instructions by the court that an accused's decision to not testify at trial is evidence of guilt. *Valdez*, 2021 UT App 13, ¶ 45. On the court's reading of the record, the State had directly elicited testimony regarding Valdez's refusal to provide the passcode during its case in chief and then used that testimony in its closing argument to undercut Valdez's defense and invite the jury to make an inference of Valdez's guilt. *Id.* ¶¶ 46–47. The court of appeals held that this use of Valdez's constitutionally protected silence against him impermissibly contravened the Fifth

---

[5] The term "foregone conclusion" first appeared in a Supreme Court case in which the Court analyzed whether an act of producing documents in response to a government subpoena might warrant Fifth Amendment protection because the act implicitly communicated information to the government. *See Fisher v. United States*, 425 U.S. 391 (1976). The Court determined that the act of production at issue was not "testimonial" because any information that was implicitly communicated by the act was already known to the government and was therefore a "foregone conclusion." *Id.* at 411. Courts have applied the foregone conclusion exception in cases involving Fifth Amendment claims ever since. *See, e.g.*, *In re Grand Jury Subpoena Duces Tecum Dated Mar. 25, 2011*, 670 F.3d 1335, 1346–49 (11th Cir. 2012); *Commonwealth v. Davis*, 220 A.3d 534, 548–51 (Pa. 2019); *People v. Sneed*, No. 127968, 2023 WL 4003913, at *13–16 (Ill. June 15, 2023).

Amendment as described in *Griffin*. *Id.* ¶¶ 47–48.[6] And the court concluded that this violation was not harmless beyond a reasonable doubt and therefore Valdez's conviction had to be vacated. *Id.* ¶¶ 51–53.

¶30 On this basis, the court of appeals reversed Valdez's conviction and remanded to the district court for further proceedings. *Id.* ¶ 58.

¶31 The State petitioned this court for certiorari, which we granted. We have jurisdiction under Utah Code section 78A-3-102(3)(a).

---

[6] Neither party challenges the court of appeals' reliance on *Griffin* on this point. Indeed, both parties rely on *Griffin* in the same manner. However, we note that the silence involved in *Griffin* was a defendant's decision not to testify *at trial*. *Griffin v. California*, 380 U.S. 609, 609–10, 614–15 (1965). In a footnote in *Miranda v. Arizona*, the Court indicated that the rationale of *Griffin* would apply to trial commentary on a defendant's post-arrest, post-*Miranda* silence. 384 U.S. 436, 468 n.37 (1966) ("In accord with our decision today, it is impermissible to penalize an individual for exercising his Fifth Amendment privilege when he is under police custodial interrogation. The prosecution may not, therefore, use at trial the fact that he stood mute or claimed his privilege in the face of accusation. *Cf. Griffin v. State of California* . . . ."). But neither of the parties have identified a case where the Court has actually applied *Griffin* to trial commentary about a defendant's post-*Miranda*, pre-trial silence. This may be because it generally looks to the Due Process Clause in such circumstances. *See Greer v. Miller*, 483 U.S. 756, 761–65 (1987) (explaining that in a case involving trial commentary on post-*Miranda*, pre-trial silence, "[t]he starting point of [the Court's] analysis is *Doyle v. Ohio*" and the Due Process Clause). We note this to clarify that if the State had challenged the applicability of *Griffin*, Valdez would have needed to provide legal argument and analysis about why *Griffin* should be extended to the circumstances here—trial commentary on Valdez's post-*Miranda*, pre-trial silence—instead of the traditional "starting point" of such an analysis under *Doyle v. Ohio* and the Due Process Clause. *Id.* at 761.

**STANDARD OF REVIEW**

¶32 "On certiorari, this court reviews the decision of the court of appeals for correctness, giving no deference to its conclusions of law." *State v. Scott*, 2020 UT 13, ¶ 27, 462 P.3d 350 (citation omitted).

**ANALYSIS**

¶33 In granting certiorari, we certified the following question:

> Whether the Court of Appeals erred in concluding that [the State's] elicitation and use of testimony about [Valdez's] refusal to provide a code for his phone constituted an impermissible commentary on an exercise of a decision to remain silent.

¶34 Both parties focus their answer to this question on whether Valdez had a Fifth Amendment right to refuse to provide his passcode in the first instance. The State argues that if Valdez had no such privilege, then at trial, "the State could introduce evidence of his refusal to comply with a lawful court order and argue that it supported his guilt." Valdez agrees with this framing of the issue. He argues that if his refusal was protected by the Fifth Amendment, then the State's trial commentary undermined his Fifth Amendment privilege against self-incrimination.[7]

---

[7] For purposes of this appeal, we address only the Fifth Amendment arguments that the parties have made. But to avoid confusion in future cases, we clarify that it is usually the Due Process Clause that governs the analysis of a claim that the State improperly commented on a defendant's post-arrest, post-*Miranda* silence at trial. Although the record indicates that Valdez was *Mirandized* and chose not to speak with police before the detective asked him for his passcode, we do not opine on how the Due Process Clause applies here because Valdez has not advanced such an argument. But we clarify that, generally, the United States Supreme Court has established that the government cannot comment at trial on a defendant's post-arrest, post-*Miranda* silence as a matter of fundamental fairness under the Due Process Clause. *See Doyle v. Ohio*, 426 U.S. 610, 617–18 (1976). This is so because the *Miranda* warning itself carries an implicit assurance that silence will carry no penalty. *Id.* at 618. In other words, "once a person has been told they have 'the right to remain silent,' it is unconstitutional to then use their silence against them." *State v. Bonds*, 2023 UT 1, ¶ 51 n.10, 524 P.3d 581 (quoting *Doyle*, 426 U.S. at 617–18). And this due

(continued . . .)

¶35 The State argues that the court of appeals erred in reversing Valdez's conviction for three reasons: (1) Valdez's refusal was not protected by the Fifth Amendment because providing a cell phone passcode to law enforcement is not a testimonial communication; (2) even if Valdez's statement of his passcode had some testimonial value because it would implicitly communicate that Valdez knew the passcode, the police already knew the phone belonged to Valdez, so the foregone conclusion exception should apply in this case; and, in the alternative, (3) the prosecutor's trial commentary was a fair response to Valdez putting the phone's contents at issue.

¶36 We first address the State's argument that providing a passcode is not a testimonial communication. We disagree. Providing a passcode is testimonial because it is a communication that discloses information from the person's mind. We then move to the State's other arguments. We conclude that the foregone conclusion exception does not apply here. That exception arises in cases involving compelled acts of producing evidence to determine whether the act has any testimonial value because the act implicitly conveys information. Such an analysis is not necessary in a case involving a verbal statement that explicitly provides information. And finally, we reject the State's argument that the State's

process rationale does not depend on whether the "silence" would independently qualify for Fifth Amendment protection. *See Wainwright v. Greenfield*, 474 U.S. 284, 291 n.7 (1986) ("Notably, the Court in *Doyle* did not rely on the contention that Ohio had violated the defendants' Fifth Amendment privilege against self-incrimination by asking the jury to draw an inference of guilt from the exercise of their constitutional right to remain silent."); *Salinas v. Texas*, 570 U.S. 178, 188 n.3 (2013) ("Petitioner is correct that *due process* prohibits prosecutors from pointing to the fact that a defendant was silent after he heard *Miranda* warnings, *Doyle v. Ohio*, 426 U.S. 610, 617–618, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), but that rule does not apply where a suspect has not received the warnings' implicit promise that any silence will not be used against him . . . ."). Accordingly, while we analyze here whether Valdez's refusal meets the requirements for Fifth Amendment protection because that is the argument before us, we want to make clear that, in general, the Due Process Clause protects an accused's post-arrest, post-*Miranda* silence *because they have been told that they have the right to remain silent*, regardless of whether the statement was compelled, testimonial, and incriminating.

commentary at trial was permissible because it was a fair response to arguments made by Valdez.

¶37  These are the only challenges the State raises to the court of appeals' decision. It does not argue that the communication was not compelled or incriminating, so those issues are not before us. Accordingly, the State has not persuaded us that the court of appeals' decision should be reversed. And we affirm.

## I. VERBALLY PROVIDING A CELL PHONE PASSCODE TO LAW ENFORCEMENT IS A TESTIMONIAL COMMUNICATION

¶38  The State's first contention is that providing a cell phone passcode to law enforcement is not "testimonial" under the Fifth Amendment because the passcode has no inherent semantic content and is equivalent to the physical act of turning over a key. The Self-Incrimination Clause of the Fifth Amendment reads: "No person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. The Supreme Court has explained that "the privilege protects a person only against being incriminated by his own compelled testimonial communications." *Doe v. United States*, 487 U.S. 201, 207 (1988) (cleaned up). Thus, the Self-Incrimination Clause applies to communications that are "testimonial, incriminating, and compelled." *Hiibel v. Sixth Jud. Dist. Ct. of Nev., Humboldt Cnty.*, 542 U.S. 177, 189 (2004).

¶39 The court of appeals stated that the "compelled" and "incriminating" elements of the Fifth Amendment analysis were not disputed in this case. *State v. Valdez*, 2021 UT App 13, ¶ 25, 482 P.3d 861. The parties have not argued otherwise on certiorari. And the State challenges only the court of appeals' conclusion that providing a passcode is "testimonial." So this case turns only on whether verbally providing a passcode to a cell phone is a "testimonial communication."[8]

---

[8] In this case, determining the testimonial nature of providing a passcode is largely a legal issue that we can determine on the record before us. But if there would have been a dispute about whether the communication was compelled or incriminating, it would have been difficult to resolve those issues on this record. This is because the State did not move in the district court to compel Valdez to provide his passcode (or an unlocked phone). So there was no direct litigation in the district court as to whether the Fifth Amendment shielded Valdez from doing so. There was only a

(continued . . .)

¶40   In general, "to be testimonial, an accused's communication must itself, explicitly or implicitly, relate a factual assertion or disclose information." *Doe*, 487 U.S. at 210. This is because it is the "extortion of information from the accused himself that offends our sense of justice." *Couch v. United States*, 409 U.S. 322, 328 (1973). Put another way, the "touchstone" used to determine if communication "is testimonial is whether the government compels the individual to use the contents of his own mind to explicitly or implicitly communicate some statement of fact." *In re Grand Jury Subpoena Duces Tecum Dated Mar. 25, 2011*, 670 F.3d 1335, 1345 (11th Cir. 2012) (cleaned up). "Only then is a person compelled to be a 'witness' against himself." *Doe*, 487 U.S. at 210.

¶41   Although the Supreme Court has not yet addressed how the Fifth Amendment applies in this factual context, many state and federal courts have grappled with this issue. In doing so, the courts have generally faced two different factual scenarios that vary based on *how* law enforcement sought to decrypt the contents of the seized device. As the court of appeals identified, there are two common ways law enforcement might go about accessing the contents of a suspect's locked cell phone that entail the suspect's cooperation. *Valdez*, 2021 UT App 13, ¶ 32. First, an officer could ask or seek to compel the suspect to provide the passcode verbally or in writing. *Id.* Or second, an officer could ask or seek to compel the suspect to turn over an unlocked phone—whether through biometric means (for example, fingerprint or facial identification) or through entering the passcode themselves without providing

_____

passing reference to the Fifth Amendment at trial in relation to whether the prosecutor's comments were permissible. Consequently, there is not much evidence or legal argument in the record relevant to whether the communication was compelled, testimonial, and incriminating. And there are no factual findings or legal conclusions by the district court with respect to those issues. Because the State has not disputed that the communication here was compelled and incriminating, we need not address those Fifth Amendment elements and we focus only on the testimonial nature of the communication at issue. We express no opinion as to whether the communication here was compelled and incriminating. But in future cases involving disputes over government efforts to compel the decryption of the contents of electronic devices, we encourage parties to develop in the district court a sufficient factual and legal record of the application of the Fifth Amendment if they wish to seek appellate review of these emergent issues.

the passcode to police. *Id.* In the first scenario, the suspect is asked to *tell* the officers what the passcode is, the officers learn that information, and the officers may enter the code into the phone to unlock it themselves. *Id.* In the second scenario, the suspect is asked to *do* something to unlock the phone themselves, but they are not asked to, and do not, share the passcode itself with law enforcement. *Id.*

¶42 The scenarios are similar in many respects. In both, law enforcement is interested in the contents of the device, not the passcode itself—although there could be unique circumstances where a passcode has some independent meaning relevant to an investigation. But for the most part, we agree with the State that the passcode functions primarily like a key to unlock the device. It generally does not have meaning of its own. And functionally, there may not be much real-world difference between verbally speaking or writing out a passcode for the police and physically providing an unlocked device to the police. Both give access to the contents of the device—the ultimate objective of law enforcement.

¶43 Yet, the two scenarios present distinct issues under the Fifth Amendment. The first scenario involves an oral or written statement explicitly conveying information. It presents what we might call "[o]rdinary testimony," which "involves a person communicating facts through language, using arbitrary sounds that the witness and the listeners intend and understand to be communicative." Laurent Sacharoff, *What Am I Really Saying When I Open My Smartphone? A Response to Orin S. Kerr*, 97 TEX. L. REV. ONLINE 63, 66 (2019).

¶44 The second scenario involves a physical act that may implicitly convey information to the government.[9] Physical acts may or may not implicate the Fifth Amendment, depending on the factual circumstances. The Supreme Court has held that certain physical acts, such as providing a blood sample, giving a handwriting or voice exemplar, standing in a lineup, or wearing a particular item of clothing do not require a person to disclose the contents of their mind. *Doe*, 487 U.S. at 210. Rather, these acts "make[] a suspect or accused the source of real or physical evidence" themselves. *Schmerber v. California*, 384 U.S. 757, 764

---

[9] *See Doe v. United States*, 487 U.S. 201, 210 (1988) ("[I]n order to be testimonial, an accused's communication must itself, *explicitly* or *implicitly*, relate a factual assertion or disclose information.") (emphasis added)).

(1966) (cleaned up). These acts do not require the suspect to "testify against himself[] or otherwise provide the State with evidence of a testimonial or communicative nature" and, accordingly, are not "testimonial" under the Fifth Amendment. *Doe*, 487 U.S. at 210–11.

¶45 In contrast, the Court has deemed some physical acts to have testimonial value and therefore to fall within the Fifth Amendment's protection. In a line of cases involving government subpoenas for the production of evidence, the Supreme Court has held that sometimes an "act of producing evidence . . . has communicative aspects of its own, wholly aside from the contents . . . produced." *Fisher v. United States*, 425 U.S. 391, 410 (1976). Though the act of production does not explicitly communicate information through oral or written language, it may implicitly communicate certain information to the government. For instance, the act of responding to a subpoena for documents "tacitly concedes the existence of the papers demanded and their possession or control by the [suspect]. It also would indicate the [suspect's] belief that the papers are those described in the subpoena." *Id.*

¶46 In attempting to distinguish acts that are not testimonial from those that are, some courts have turned to an analogy advanced by Justice Stevens in his dissent in *Doe*, 487 U.S. at 219–21 (Stevens, J., dissenting). Justice Stevens presented two circumstances: a suspect turning over a physical key to a strongbox and a suspect revealing the combination to a wall safe. *Id.* at 219. To Justice Stevens, under the Fifth Amendment, a suspect "may in some cases be forced to surrender a key to a strongbox containing incriminating documents," but that person cannot "be compelled to reveal the combination to his wall safe—by word or deed." *Id.* The majority in *Doe* agreed with Justice Stevens's formulation, stating that it did "not disagree with the dissent that the expression of the contents of the individual's mind is testimonial communication." *Id.* at 210 n.9 (cleaned up). But the majority held that the compelled act at issue in that case was "more like being forced to surrender a key to a strongbox containing incriminating documents than it is like being compelled to reveal the combination to [a] wall safe." *Id.* (cleaned up).

¶47 Then, in *United States v. Hubbell*, 530 U.S. 27 (2000), the Supreme Court further utilized the key/combination analogy. The Court explained that in identifying, assembling, and producing the large number of documents requested by a government subpoena in that case, "[i]t was unquestionably necessary for [the]

respondent to make extensive use of the contents of his own mind." *Id.* at 43 (cleaned up). And it held that doing so was "like telling an inquisitor the combination to a wall safe, not like being forced to surrender the key to a strongbox." *Id.*

¶48   Thus, determining which scenario we are presented with dictates the analytical framework we must use to determine whether a statement or act is testimonial. If we are dealing with a suspect's oral or written communication that explicitly conveys information from the suspect's mind (scenario number one), we are in familiar Fifth Amendment territory. But if we are faced with a compelled act of producing evidence—such as handing over an unlocked phone (scenario number two)—we must determine whether the act implicitly conveys information and therefore has testimonial value for Fifth Amendment purposes.

¶49   In this case, we agree with the court of appeals that the best reading of the record is that the detective asked Valdez to verbally provide his passcode, placing us in scenario number one. *Valdez*, 2021 UT App 13, ¶ 34. At trial, the detective testified that he explained to Valdez that he "had a search warrant" for the phone, that he "was asking for [Valdez's] [passcode]," and that Valdez responded by "refus[ing] to give [the detective] the [passcode]." Neither the State nor Valdez questioned the detective about the details of this exchange—like whether he asked Valdez to verbally tell him the passcode, to physically demonstrate the swipe pattern, or to input the passcode and hand over the unlocked phone. Nevertheless, we agree with the court of appeals that the best reading of the record is that the detective asked Valdez to tell him the passcode to the phone. The detective testified that he "asked for" the passcode and that Valdez refused "to give [him] the [passcode]." And the State has not challenged the court of appeals' reading of the record on certiorari. We therefore proceed with the understanding that the first scenario discussed above applies here: that the police officer asked Valdez to provide the passcode itself and did not ask Valdez to unlock the phone and then hand it over.

¶50 Although this case involves the oral provision of a passcode, the State applies the United States Supreme Court's act-of-production jurisprudence. The State argues that providing a memorized passcode to a cell phone is more akin to handing over a physical key than providing the combination to a wall safe. The State explains that all phone passcodes rely on encryption, which makes a message secret using an algorithm. To decrypt it is to reveal the secret using a "key" derived from the encryption

algorithm. (Citing David W. Opderbeck, *The Skeleton in the Hard Drive: Encryption and the Fifth Amendment*, 70 FLA. L. REV. 883, 885 (2018).) The State further explains that a "decryption key is simply the mirror image of the encryption algorithm." And since it has "no use or meaning but to decrypt that set of data, returning it to readable form," "it lacks 'semantic content and is entirely functional.'" (Quoting Opderbeck, *supra*, at 916.) And the State reasons that since a passcode is functionally a key, "[a]ll Valdez would have been compelled to do was to open the door to [the police]." The State queries, "If a person opens the door to a home that police have a warrant to search, how has he testified?" On this basis, the State argues that turning over a passcode is like handing over a physical key, which is a non-testimonial act of production.

¶51   While we recognize that communicating a passcode to the police and physically providing an unlocked phone to the police may be functionally equivalent in many respects, this functional equivalency is not dispositive under current Fifth Amendment jurisprudence. We conclude that the act-of-production analytical framework makes sense only where law enforcement compels someone to perform an *act* to unlock an electronic device. Where an act is involved, the act-of-production analysis teases out whether the act implicitly communicates information and, therefore, has testimonial value.[10] But where a suspect is asked to provide their

---

[10] *See, e.g.*, *In re Grand Jury Duces Tecum Dated Mar. 25, 2011*, 670 F.3d 1335, 1341 (11th Cir. 2012) (applying the act-of-production doctrine in the context of a court order "to compel [an individual] to decrypt and hand over the contents of" certain hard drives); *Commonwealth v. Gelfgatt*, 11 N.E.3d 605, 611 (Mass. 2014) (analyzing whether "compelling the defendant to enter the key to encryption software on various digital media storage devices" compelled a "testimonial communication" under the act-of-production doctrine); *State v. Stahl*, 206 So. 3d 124, 133 n.9 (Fla. Dist. Ct. App. 2016) (applying the act-of-production doctrine where "[n]either the State nor [the defendant] addresse[d] the State's request as anything but an act of production," but noting "it [was] not entirely clear from the record whether the State want[ed] [the defendant] to testify to the passcode or to enter it into the phone," and that "[i]f the former, the State's request could [have] be[en] considered under the traditional analysis of the self-incrimination privilege—that of verbal communications"); *Seo v. State*, 148 N.E.3d 952, 954 (Ind. 2020) (applying the act-of-production doctrine where

(continued . . .)

passcode to law enforcement, the act-of-production analysis is not useful. Directly providing a passcode to law enforcement is not an "act." It is a statement. There is no need to tease out whether the statement implicitly communicates information to determine whether it has testimonial value. The statement explicitly communicates information from the suspect's own mind. Accordingly, it is a traditional testimonial communication. And there is no need to resort to the act-of-production framework.

¶52 Notably, scholars appear to recognize this fundamental distinction. For example, in limiting the scope of one of his articles, Orin S. Kerr focused his discussion on "the Fifth Amendment framework for compelling *acts of decryption* by entering a password without disclosing it to the government" because "[c]ompelled use of biometrics and *compelled disclosure* of passwords raise different Fifth Amendment issues." Orin S. Kerr, *Compelled Decryption and the Privilege Against Self-Incrimination*, 97 TEX. L. REV. 767, 768 n.5 (2019) (emphasis added).

¶53 And in another article, Kerr and Bruce Schneier discussed the various ways that law enforcement might obtain access to the encrypted contents of locked cell phones. They observed that in one method, "the government might seek an order requiring a person to disclose [a passcode] to the government." Orin S. Kerr & Bruce Schneier, *Encryption Workarounds*, 106 GEO. L.J. 989, 1001 (2018). But they noted that "[t]he primary barrier to this method is the Fifth Amendment privilege against self-incrimination." *Id.* They explained that "[w]hen the government uses the threat of legal punishment to compel an individual to divulge a [passcode], the government is seeking to compel testimony. The person is being forced to go into his memory and divulge his recollection of the [passcode]." *Id.* at 1001–02 (cleaned up).

¶54 In this same article, shifting to compelled decryption specifically, Kerr and Schneier posit that "the government might instead order individuals to produce a decrypted device. Investigators typically provide the person with a locked device, and the person can comply with the order by entering the [passcode] without disclosing it to the government." *Id.* at 1002. The authors state that "[t]he Fifth Amendment once again provides the legal framework, although the standard for compelled *acts of*

---

a warrant "compelled [the defendant] to unlock [a] device and stated [the defendant] would be subject to the contempt powers of the court if she failed to do so" (cleaned up)).

*decryption* may be different than the standard for *disclosing* a [passcode]." *Id.* (emphasis added) (footnote omitted). And they continued, stating that "[c]ourts have analyzed compelled acts of decryption under the act of production doctrine . . . . [where] an act is testimonial for what it *implicitly* communicates about a person's state of mind." *Id.* (emphasis added).

¶55 Another scholar, Laurent Sacharoff, has referred to this type of implicit communication as "quasi testimony" because the "inadvertent communication does not entirely resemble ordinary speech." Laurent Sacharoff, *Unlocking the Fifth Amendment: Passwords and Encrypted Devices*, 87 FORDHAM L. REV. 203, 218 n.98 (2018). Indeed, the term "reminds us that the [Supreme] Court affords act-of-production testimony less protection under the Fifth Amendment than it does to full-fledged oral or written testimony." *Id.* To Sacharoff, this discrepancy in protection is logical because requiring a suspect to verbally state a passcode to the government "directly involve[s] testimony in its purest form and therefore should trigger direct Fifth Amendment protections." *Id.* at 223. Accordingly, "stating a password to authorities falls within this core protection" of the Fifth Amendment. *Id.* at 224.

¶56 Sacharoff provides a useful example that may help illuminate the distinction. *See id.* at 225. Assume that a criminal suspect has the passcode to their desktop computer written down on a sticky note in their filing cabinet at home. Further assume that in seeking to obtain files on the suspect's desktop computer in an ongoing criminal investigation into the suspect, the government subpoenas the suspect to produce any documents with the password to the computer. As Sacharoff points out, while "such compulsion does not directly violate the Fifth Amendment because the person voluntarily created the document before the subpoena and has thus not been compelled[,] . . .the Fifth Amendment may protect against such compulsion if the *act* of producing [the sticky note] with the password would, itself, be testimonial." *Id.* This is because by producing the sticky note, the suspect "implicitly testifies that the number written there *is* a password and that it is a password for *this* device." *Id.* "In other words, [the suspect] authenticates the content by producing it." *Id.* But if the suspect had been compelled to *say* their computer password to the government, there would be no need to use the act-of-production doctrine to determine if the communication was testimonial—such a communication is testimony in its traditional form, commanding protection under the Fifth Amendment.

¶57 Here, Valdez was asked to verbally communicate his passcode to police—a traditional testimonial statement. So while speaking a passcode and turning over an unlocked phone may be equivalent in many respects, they are not the same for Fifth Amendment purposes. Accordingly, we conclude that the act-of-production jurisprudence does not apply to the facts here. There is no need for us to determine whether any physical act of producing evidence has sufficient testimonial value, as we are dealing with traditional testimony, which would have directly conveyed information to the government.

¶58 Therefore, we agree with the court of appeals that Valdez's statement of his passcode to the detective would have been testimonial under the Fifth Amendment.

## II. THE FOREGONE CONCLUSION EXCEPTION DOES NOT APPLY

¶59 The State next argues that even if Valdez's statement of his passcode was testimonial, the Fifth Amendment still did not protect his refusal to provide the passcode under the foregone conclusion exception. We disagree with the State's invocation of the foregone conclusion exception in these circumstances. We conclude that it applies only in act-of-production cases.

¶60 The foregone conclusion exception was first articulated by the Supreme Court in *Fisher v. United States*, 425 U.S. 391 (1976). In *Fisher*, taxpayers under investigation for violations of federal tax laws obtained certain tax documents created by their accountants and subsequently transferred the documents to their attorneys in light of the criminal investigation. *Id.* at 393–94. After learning the whereabouts of the tax documents, the government subpoenaed the attorneys to turn them over. *Id.* at 394. The taxpayers sought to prevent their attorneys from turning over the documents, arguing that such action would violate their Fifth Amendment right against self-incrimination. *Id.* at 395.

¶61 In its analysis, the Court first acknowledged that "[t]he act of producing evidence in response to a subpoena . . . has communicative aspects of its own," including a concession of "the existence of the papers demanded[,] . . . their possession or control by the [suspect]," and the suspect's belief "that the papers are those described in the subpoena." *Id.* at 410. Accordingly, the act of turning over documents requested in a subpoena may itself be "testimonial" under the Fifth Amendment. *Id.* Nonetheless, on the facts of *Fisher*, the Court found it "doubtful that implicitly admitting the existence and possession of the papers rises to the

level of testimony within the protection of the Fifth Amendment." *Id.* at 411. The Court reasoned that because the government already knew the tax documents existed and that the lawyer possessed the documents, any information regarding the existence and possession of the documents was "a foregone conclusion" and the act of turning them over "add[ed] little or nothing to the sum total of the Government's information . . . ." *Id.* In other words, the attorneys' act of gathering the documents and giving them to the government did not give the government any information it did not already have. To the Court, "[t]he question [was] not of testimony but of surrender." *Id.* (cleaned up). Thus, the Court held that while the act of turning over documents under a subpoena may have testimonial aspects, on the facts of *Fisher*, the surrender of the tax documents was not "testimonial" for Fifth Amendment purposes.

¶62 As the court of appeals noted, the Supreme Court has only mentioned the foregone conclusion exception on one other occasion since its introduction in 1976. In *United States v. Hubbell*, 530 U.S. 27 (2000), the government subpoenaed a suspect to turn over different categories of documents to determine if the suspect had complied with the terms of a prior plea agreement. *Id.* at 30–31. The suspect initially asserted his Fifth Amendment right against self-incrimination to avoid disclosing any documents that may have been responsive to the subpoena. *Id.* at 31. But the suspect ultimately complied and turned over a number of documents to the government. *Id.* Upon review, the government discovered previously unknown information in the documents, which led to new tax-related charges against the suspect. *Id.* at 31–32. Notably, the government admitted that when it served the subpoena, it was not investigating the suspect for any tax crimes and was unaware of which documents existed, which documents were in the suspect's possession, or what information those documents contained. *Id.* at 32.

¶63 First, the Court held that the suspect's act of turning over the documents was testimonial, as it relayed to the government information regarding the existence and location of the documents requested by the government. The Court then referred back to the "foregone conclusion" language it had used in *Fisher*, stating that,

> Whatever the scope of this "foregone conclusion" rationale, the facts of this case plainly fall outside of it. While in *Fisher* the Government already knew that the documents were in the attorneys' possession and

22

> could independently confirm their existence and authenticity through the accountants who created them, here the Government has not shown that it had any prior knowledge of either the existence or the whereabouts of the . . . documents ultimately produced by [the suspect].

*Id.* at 44–45. So unlike in *Fisher*, the government in *Hubbell* had no independent knowledge of the information it was seeking such that any information conveyed in the act of production would have been a foregone conclusion.

¶64 The limited context in which the Supreme Court has discussed the foregone conclusion exception (or "foregone conclusion rationale," as *Hubbell* put it) demonstrates its narrow focus. As the court of appeals stated below, "[t]he [Supreme] Court has never applied the exception outside of the context of assessing the testimoniality of a nonverbal act of producing documents." *State v. Valdez*, 2021 UT App 13, ¶ 42, 482 P.3d 861.

¶65 We agree with the court of appeals. We view the foregone conclusion exception as being inapplicable outside of the act-of-production context. Notably, the Supreme Court has not applied the exception to verbal statements. And it has not extended its reach beyond the act-of-production context. Accordingly, we conclude that the foregone conclusion exception does not apply here.

## III. THE STATE'S TRIAL COMMENTARY IS NOT PERMISSIBLE AS A "FAIR RESPONSE" TO AN ARGUMENT VALDEZ INITIATED

¶66 Finally, in response to our supplemental briefing order, the State argues that even if Valdez had a Fifth Amendment right to refuse to provide his passcode, the State nonetheless did not violate Valdez's rights by commenting on his silence at trial. It asserts that such commentary was a fair response to Valdez putting the contents of the phone at issue. We view the record otherwise.

¶67 The United States Supreme Court has held that while a defendant's silence will generally carry no penalty at trial, the defendant is not allowed to use their Fifth Amendment silence as a "sword" rather than a "shield." *United States v. Robinson*, 485 U.S. 25, 32 (1988) (quoting *United States v. Hasting*, 461 U.S. 499, 515 (1983) (Stevens, J., concurring)). Accordingly, in the trial testimony context, the Court has stated that "where . . . the prosecutor's reference to the defendant's opportunity to testify is a fair response

to a claim made by defendant or his counsel, we think there is no violation of the [Fifth Amendment]." *Id.*[11]

¶68 But, assuming the rationale of *Robinson* applies here, we cannot say that Valdez unfairly used his silence as a "sword" and a "shield." It was the State that first put the contents of the text messages at issue. In its case in chief, the State introduced evidence through Jane that Valdez had sent her text messages to coordinate their meeting.

¶69 And before Valdez raised any issue about the content of the text messages, the State elicited testimony in its case in chief that the police could not access the contents of Valdez's cell phone because he had refused to provide the passcode. On direct examination, the prosecutor asked the detective: "[A]re you familiar with why you were unable to access the data" contained in the phone? After the district court overruled Valdez's Fifth Amendment objection to the question, the detective answered that Valdez "refused to give me the [passcode] and just told me to destroy the phone." It was after this, in his case in chief, that Valdez elicited testimony from his ex-wife characterizing the text exchange as sexual in nature.

¶70 The State argues that the detective's testimony does not implicate the Fifth Amendment because it was a "mere mention" of Valdez's refusal to provide his passcode and not an attempt to use his silence against him. (Citing *State v. Harmon*, 956 P.2d 262, 268–69 (Utah 1998).) The State asserts that it did not use Valdez's silence against him until its closing, which occurred *after* Valdez's elicitation of his ex-wife's testimony regarding the text messages.

¶71 But we agree with the court of appeals that the import of the detective's testimony was to suggest that Valdez *should have*

---

[11] In *United States v. Robinson*, 485 U.S. 25 (1988), defense counsel made numerous statements criticizing the government for not giving the defendant a fair opportunity to explain the actions for which he was being prosecuted. *Id.* at 27–28. In response, the prosecutor pointed out that the defendant had the opportunity to tell his story on the witness stand. *Id.* at 28. The Supreme Court concluded that the prosecutor's commentary was permissible because it "did not treat the defendant's silence as substantive evidence of guilt, but instead referred to the possibility of testifying as one of several opportunities which the defendant was afforded, contrary to the statement of his counsel, to explain his side of the case." *Id.* at 32.

provided his passcode and was obstructing law enforcement's investigation by refusing to do so. *State v. Valdez*, 2021 UT App 13, ¶ 25, 482 P.3d 861 ("The State implied at trial that Valdez had an obligation to provide the swipe code to the investigating officers, and that he had no right to refuse."). In countering Valdez's objection to the detective's testimony, the State did not argue to the district court that it needed to admit the testimony as a response to an issue Valdez had raised. Rather, the State pointed out that the detective had a warrant to search the phone, and it argued that "[t]he jury ha[d] a right to know why the officers were unable to access the phone when there could have been evidence very pertinent to the case."

¶72 On these facts, the State's elicitation and use of Valdez's refusal at trial do not constitute a permissible "fair response" to an argument initiated by Valdez.

## CONCLUSION

¶73 We hold that verbally providing a cell phone passcode to law enforcement is testimonial for Fifth Amendment purposes. Since the disclosure of a passcode involves traditional oral testimony, the act-of-production analysis urged by the State does not apply. And for the same reasons, the foregone conclusion exception is inapplicable. This exception has been discussed twice by the Supreme Court, and both times, the case involved the compelled *act* of producing evidence. The Supreme Court has not extended the exception to cover verbal testimonial statements, and we see no justification to do so either. Finally, the State cannot avail itself of the Supreme Court's "fair response" precedent because, even if such precedent applies, the State elicited testimony about the text messages and Valdez's refusal to provide his passcode before Valdez put on evidence about the contents of the text messages on his phone. Accordingly, Valdez did not use his prior silence as both a "sword" and a "shield."

¶74 We note that the court of appeals found that the Fifth Amendment violation in this case was not harmless beyond a reasonable doubt and that Valdez's conviction should therefore be vacated. The State has not challenged those rulings on certiorari.

¶75 We affirm the court of appeals and remand to the district court for further proceedings in accordance with this opinion.

_____